IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH PRISE, HEATHER RADY              )
on behalf of themselves and all          )
employees similarly situated,            )
                                         )          Civil Action No. 06-1641
                    Plaintiffs,          )
                                         )
            v.                           )
                                         )
ALDERWOODS GROUP, INC.                   )
                                         )
                    Defendant.           )

CONTI, District Judge.

## I. Introduction

Pending before the court is a motion to decertify the conditionally certified collective action (ECF No. 1608). The motion was filed by defendant Alderwoods Group ("Alderwoods" or "defendant") on January 31, 2011. Plaintiffs Deborah Prise and Heather Rady (together with opt-in plaintiffs, "plaintiffs"), on behalf of themselves and all employees similarly situated, moved to conditionally certify a collective action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). Defendant asserts the conditionally certified class is ripe for decertification because, after years of litigation and extensive discovery, plaintiffs, who number in excess of seven hundred, did not meet their burden under the FLSA to demonstrate they are similarly situated. Because plaintiffs did not satisfy their burden to show they are similarly situated, the motion to decertify will be granted.

## II. Procedural history

On December 8, 2006, plaintiffs instituted this lawsuit as a putative collective action. (ECF No. 1.)  On May 18, 2007, the court initially conditionally certified the collective action to encompass seven employment positions and five employment policies.  (See Order on Collective Action (ECF No. 224) at 1.)  On November 29, 2007, plaintiffs filed an amended complaint. (Am. Compl. (ECF No. 819).)  On July 14, 2008, the court entered a second order that added two employment positions to the action (funeral services support-4 and location administrator).  (See Second Order on Collective Action (ECF No. 1148) at 1.)  On July 22, 2008, the court issued a discovery order permitting the parties, *inter alia*, to take discovery relating to twenty-three individuals (including named plaintiffs) ("sample plaintiffs").  (Disc. Order (ECF No. 1155) at 3.)  On December 20, 2010, the court held a motion hearing and included a sixth employment policy related to meal break compensation under the FLSA.  (See 12/20/2010 minute entry.)  At the hearing, the parties stipulated that it was unnecessary to send further notice regarding the meal break policy.  (Id.)

On January 31, 2011, defendant filed the motion for decertification of the conditionally certified collective action.  On June 13, 2011, the court held oral argument on the decertification motion and other outstanding miscellaneous motions.  The court permitted the parties to conduct a one-hour supplemental deposition of Federal Rule of Civil Procedure 30(b)(6) witness Ron Collins ("Collins"), an Alderwoods' vice president of operations for the Northeast United States and Canada from 1999 to 2006 (Def.'s Reply (ECF No. 1616), Ex. I ¶ 2.), and requested supplemental briefing concerning the overlapping legal standards, if any, between class action certification under Rule 23 of the Federal Rules of Civil Procedure and collective action certification under § 216(b).  The parties filed their supplemental briefing with the court and the decertification motion is ripe for consideration.

### III. Background

### A. The conditionally certified collective action and the five classes

The conditionally certified collective action consists of individuals from nine employment positions maintaining claims for five "policies" concerning alleged nonpayment of overtime, in violation of the FLSA.[1] (Id. at 4.) The nine funeral home positions are: (1) apprentice funeral director/embalmer; (2) arranger; (3) assistant funeral director; (4) community relations director; (5) funeral director/embalmer; (6) funeral director; (7) location manager; (8) funeral services support-4; and (9) location administrator.[2] (See Pls.' Status Report (ECF No. 1628), Ex. 1 ("Job Chart") at 2.) The five policies implicated in this action are: (a) community work; (b) on-call work; (c) overtime preapproval; (d) training for insurance licenses; and (e) meal break work. Plaintiffs contend that defendant's motion should be denied because the record evidence demonstrates they satisfied the "similarly situated" requirement of the FLSA. (Pls.' Resp. (ECF No. 1611) at 1.) Plaintiffs maintain that Alderwoods' pay policies were implemented on a national level and were systematically enforced at each funeral home location. (Id. at 1-2; see Ex. 64 ("Leahy Decl.") ¶ 4.)

### 1. Characteristics of the conditionally certified collective action

Alderwoods is a national corporation engaged in the funeral home business. (Am. Compl. at 2.) Generally, the 721 opt-in plaintiffs are nonexempt employees or former employees of Alderwoods who allege they were suffered or permitted to work by Alderwoods and not paid

---

[1] Plaintiffs originally desired the court to include six policies. The sixth policy concerned Alderwoods' calculation of plaintiffs' regular-rate pay. During the oral argument hearing before the court on June 13, 2011, plaintiffs advised the court that they no longer intend to pursue that particular policy. In light of that representation, the court's analysis herein is limited to the five remaining policies.

[2] The Job Chart in plaintiffs' status report does not reflect that the location manager is a relevant position; however, the parties stipulated to the inclusion of that job title in the collective action and the court included that title among the relevant positions when it conditionally certified the collective action on May 18, 2007. (See Order on Collective Action (ECF No. 224) at 1.)

their regular or statutorily required rate of pay for all hours worked.  (Id. at 3; Def.'s Mot. at 4.) Sample plaintiffs are representative of Alderwoods' national presence, hailing from states such as Pennsylvania, Georgia, California, Oklahoma, Louisiana, Alaska, Kansas, Texas, Arizona, Indiana and Washington.

### a. Community work

Plaintiffs allege that Alderwoods maintained a corporate-wide policy of encouraging or requiring employees to perform community work for Alderwoods' benefit without compensating employees for performing such work when it occurred *outside their regular work hours.*[3] Plaintiffs contend that, at a minimum, Alderwoods expected or encouraged employees to be involved in community work.  (See Pls.' Resp. at 7; see generally Pls.' App. (ECF No. 1612), Ex. 74 ("Pls.' Collins Dep.").)  Plaintiffs argue that Alderwoods required them to perform community work for the benefit of the company, and that time was compensable under the applicable caselaw.  See, e.g., Dade Cnty., Fla. v. Alvarez, 124 F.3d 1380, 1384 (11th Cir. 1997) (courts construe work under the FLSA to include all activities controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and its business). Notably, the applicable federal regulation provides that

> [t]ime spent in work for public or charitable purposes at the employer's request, or under his direction or control or while the employee is required to be on the premises, is working time. However, time spent voluntarily in such activities outside of the employee's normal working hours is not hours worked.

---

[3] Defendant takes issue with plaintiffs' decision to change the definition of the community work claim to conform to the evidence produced during discovery.  (See Def.'s Reply (ECF No. 1616) at 2-3.)  Plaintiffs respond that the court has the authority to modify the definition, but in any event could permit plaintiffs to file a second amended complaint to reflect the evidence garnered during discovery.  (Pls.' Resp. at 6 n.4.)  Even if the court permitted plaintiffs to file a second amended complaint, certification of the collective action as it stands today would continue to be problematic because certain opt-ins who checked the box on their information sheet concerning Alderwoods' community work policy may no longer have a claim under the *new* definition of that policy.  In any event, the issue is now moot based upon the court's finding that the plaintiffs are not similarly situated.

29 C.F.R. § 785.44; see Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 540 (S.D. Tex. 2008)
(triable issue existed concerning whether plaintiffs performed required or voluntary community
work under 29 C.F.R. § 785.44).  Plaintiffs contend that, at a minimum, Alderwoods requested
employees to perform public or charitable work, and its failure to compensate employees for that
work violated the FLSA.

Plaintiffs direct the court to various discovery materials to show that opt-in plaintiffs are
similarly situated to each other and the named plaintiffs.  First, plaintiffs assert that the job
descriptions of apprentice funeral director/embalmer, arranger, assistant funeral director, funeral
director, funeral director/embalmer, community relations director and location manager detailed
that employees in those positions were responsible for "retain[ing] heritage and grow[ing]
market share through active involvement with community, religious and other organizations."
(Pls.' App., Ex. 13.)[4]

Second, plaintiffs argue that Alderwoods' mandatory community leadership program
("CLP") emphasized and supported employee involvement in community activities.  (See
generally Pls.' App. Exs. 17-22.)  Third, plaintiffs rely upon, *inter alia*, the deposition testimony
of sample plaintiffs and Collins to support their position that Alderwoods *required* nonexempt
hourly employees to perform community work after-hours and failed to compensate them for
that work.

Collins testified that it was Alderwoods' policy to "encourage[] support of civic
organizations and employee involvement in worthwhile causes."  (Pls.' Collins Dep. at 137.)
Collins opined that, hypothetically, all things being equal between two applicants for a location

---

[4] The job descriptions of funeral services support-4 and location administrator were not included in plaintiffs'
exhibit 13.

manager position, the applicant with more community involvement could be more likely to receive the job offer.  (Id. at 217-18.)

Plaintiffs provided an email dated October 18, 2004, from Gary Toye ("Toye"), a market general manager in the Carolinas, to Rick Scully, the senior vice president of marketing for Alderwoods, and carbon copied to Katie Leahy, a regional general manager for the Carolinas, Kim Whitehead, a human resources specialist for Alderwoods in Toronto, Canada, and Leanne Sersun, a geographic human resource specialist, stating that community work performed during the work day was considered mandatory and therefore compensated at the employee's normal rate of pay.  (Pls.' App., Ex. 30 ("Toye email"); Collins Supp. Dep. (ECF No. 1631), Ex. C at 317-21.)  If, however, the community work occurred after hours, it was strongly encouraged and recognized in a nonmonetary way.  (Id.)[5]

Shane Carswell ("Carswell"), a funeral director, opined that he participated in community work for a Gay Pride Parade, but did not record the time and was not compensated for that time. (Def.'s App. (ECF No. 1608), Ex. R ("Dep. Excerpts"), Tab 4 ("Def.'s Carswell Dep.") at 124-

---

[5] The Toye email reads in relevant part:

> If the event is during the normal work day and it does not take place at a venue that is objectionable for a valid reason (ie [sic] a person of the Hebrew faith taking part at an event in a Christian church) then it is mandatory and the employee would be paid his or her normal rate.
>
> If the event takes place after hours, it is strongly encouraged and may be recognized in a non [sic] monetary way (ie [sic] donation or sponsorship to the organization that the employee belongs to; I Believe in Service reward points; recognition in the Geographical newsletter, etc.)[.]
>
> We encourage all the employees at the location to be involved in the community in some way and like to recognize them accordingly.  We take the growing of market share very seriously and require that everyone has a part in it.  The location manager cannot do it alone.  Some employees resent that, but without market share, all of us would be seeking gainful employment somewhere else.

(Toye email at 1.)

25.)[6] Carswell stated that he did not record the time because he would not be paid for it - performing community work was "just what [employees] were expected to do. It was part of your job. . . . It's not something you are going to get compensated for, because that's what everyone [w]as doing." (Pls.' App., Ex. 73 ("Pls.' Carswell Dep.) at 214.)

Carswell explained that Alderwoods' failure to compensate employees for performing community work was a corporate-wide policy, based upon his personal knowledge from working in other funeral homes owned by defendant, as well as practices of other Alderwoods' employees. (Id.) Carswell opined that the community work he performed generated business for Alderwoods. (Id. at 215.)

Millard Daigle ("Daigle"), a Louisiana funeral director and assistant manager, testified that he participated in two community work events, did not record the time, and was not compensated for that time because he was "just expected to show up." (Dep. Excerpts, Tab 5 ("Def.'s Daigle Dep.") at 170, 174-75; Def.'s Reply, Ex. T ("Reply Information Sheets"), Tab 2.) Herbert Bath ("Bath"), an area manager, testified that all Alderwoods employees were required to volunteer their time to outside community organizations. (Pls.' App., Ex. 69 ("Pls.' Bath Dep.") at 159.) Jason Burgess ("Burgess"), a funeral director and embalmer, did not record the time Alderwoods required he spend performing community work because he was instructed that he would not be compensated. (Pls.' App., Ex. 71 ("Pls.' Burgess Dep.") at 78-80.)

Richard Kamienski ("Kamienski"), a general manager, stated that Alderwoods required all employees under his supervision to perform community work of their choosing. (Pls.' App., Ex. 87 ("Pls.' Kamienski Dep.") at 136.) This policy was communicated to Kamienski from Bill Mitchell or Derrick Pate, and Kamienski was required to submit a monthly or bi-monthly report

---

[6] The record does not contain information about the geographic location in which Carswell worked for Alderwoods. To the extent geographic location information for other sample plaintiffs is not provided in this memorandum opinion, the court was not provided with that information in the record.

to those individuals detailing community work performed by his subordinates. (Id. at 136-37.) Employees were not permitted to record community work on their time cards. (Id. at 221.) Michael Lanza ("Lanza"), a funeral director and embalmer in Washington, opined that his regional manager for Alderwoods told him that he (Lanza) was required to perform community work, and that the regional manager wanted to see a monthly report reflecting that work. (Pls.' App., Ex. 90 ("Pls.' Lanza Dep.") at 236-37; Ex. 12 ("Pls.' Information Sheets").)

Kasi Long ("Long"), a funeral director, explained why she seeks compensation for performing community work during her employment with Alderwoods: "I do believe that Alderwoods was requiring us to be participants in that community involvement. They looked at it every month, and they did not make accommodations to compensate us for that extra time outside of work hours that we were promoting their business." (Pls.' App., Ex. 92 ("Pls.' Long Dep.") at 181.)

Beverley McDonald ("McDonald"), a Texas funeral director and embalmer, testified that she was required by her supervisor to join three community service organizations because it was "Alderwoods' policy that everybody had to be active in the community and join service organizations." (Pls.' App., Ex. 94 ("Pls.' McDonald Dep.") at 138-39; Reply Information Sheets, Tab 8.) McDonald did not report her hours performing community work because it was Alderwoods' policy not to compensate employees for that kind of work. (Pls.' McDonald Dep. at 152-53.) McDonald did not receive compensation for her community work, even after raising the issue with her supervisor. (Id. at 144-45.)

Alderwoods argues that sample plaintiffs' testimony differed substantially on whether they were required to do community work, the type of community work performed, time reporting and compensation practices related to community work and the relief they seek.

(Def.'s Mot. at 5.)  Because plaintiffs modified their definition of the community work policy after the opt-in notice was mailed, it is unclear which of the 721 opt-in plaintiffs performed community work after their regularly scheduled hours.  (Hr'g Tr. 6/13/2011 (ECF No. 1624) at 19.)  Alderwoods points to testimony regarding a change in the community work compensation policy during the class period as further evidence that opt-in plaintiffs are not similarly situated to the named plaintiffs.  (See Dep. Excerpts, Tab 28 ("Def.'s Rady Dep.") at 61-62.)

With respect to the CLP, Alderwoods contends that the CLP did not require community work to be performed outside regularly scheduled business hours or that such work outside regularly scheduled business hours would be uncompensated.  (Def.'s Reply at 3.)  As for the Toye email, Collins stated that Toye was a market general manager in the Carolinas whose responsibilities were limited to six funeral homes, two combination funeral homes/cemeteries, and four cemeteries.  (Def.'s Reply, Ex. I ("Collins Reply Decl.") ¶ 4; Collins Supp. Dep. at 319.)  Collins emphasized the Toye email was a misstatement of Alderwoods' company policy regarding community work.  (Id. ¶ 5.)  Collins maintained that Alderwoods' policy was to pay employees for all community service performed for the benefit of Alderwoods.  (Id.)

A Pennsylvania location manager, Deborah Prise ("Prise"), testified that if she did community work after business hours and sought preapproval for that work, she was compensated for that time.  (Dep. Excerpts, Tab 27 ("Def.'s Prise Dep.") at 88.)  Prise recalled one instance where she sought preapproval to perform community work and was partially paid.  (Id. at 89.)  Prise stated that, at some point, she quit her job because it was general knowledge that if employees engaged in community activity outside business hours, that time would not be preapproved.  (Id.)

A Pennsylvania funeral director and embalmer, Heather Rady ("Rady"), explained that at some uncertain time, Alderwoods' community work policy changed. (Def.'s Rady Dep. at 61.) Prior to the change, Rady was not compensated for community work, and after the change, Rady received compensation for that work. (Id. at 61-62.)

Collins stated that he never observed the use of performance improvement plans (i.e., a company method to improve employee performance) to warn employees regarding a failure to participate in community activities. (Pls.' Collins Dep. at 219-20.) A location manager, Dennis Baker ("Baker"), testified that employees were encouraged to volunteer their time to community organizations, but Alderwoods did not require community work. (Def.'s App., Ex. T ("Manager Dep. Excerpts"), Tab 1 ("Def.'s Baker Dep.") at 128.) A location manager, Ric Hensley, opined that, in the five locations he managed, not all employees joined a civic organization or performed community work. (Manager Dep. Excerpts, Tab 3 ("Def.'s Hensley Dep.") at 50.) To the extent employees declined to participate in community work, their employment was not negatively impacted by their decision. (Id. at 54-55.) Kamienski explained that he managed employees who did not perform community service. (Manager Dep. Excerpts, Tab 4 ("Def.'s Kamienski Dep.") at 144.) Specifically, only ten percent of the employees he managed performed community service, and the remaining employees were not disciplined for refusing, directly or indirectly, to perform community work. (Id. at 143-44.)

Besides management testimony, many plaintiffs testified that Alderwoods did not have a policy that required them to perform after-hours community work.[7] (See, e.g., defendant's

---

[7] Plaintiffs contend that these opt-ins did not have claims for violations of the community work policy (i.e., they did not check the community work box on their information sheet), and so their testimony regarding the requirements of that policy is irrelevant. (See Pls.' Resp. at 11.) Plaintiffs make similar arguments regarding sample plaintiff testimony in the other compensation classes. The court still finds this testimony probative of whether Alderwoods' maintained a corporate-wide policy that required or encouraged employees to perform community work outside regular business hours and did not compensate employees for that work. The fact that many sample plaintiffs testified that they were not required to perform community work is highly suggestive that a corporate-wide policy

deposition excerpts of Alaska funeral director and embalmer, Jeffrey Diggs ("Diggs"), Tab 7 ("Def.'s Diggs Dep.") at 73; Reply Information Sheets, Tab 3; funeral director Donna Gonzales ("Gonzales"), Tab 13 ("Def.'s Gonzales Dep.") at 182; funeral director and embalmer, Louise Johnson ("Johnson"), Tab 15 ("Def.'s Johnson Dep.") at 45; apprentice funeral director/embalmer, Adrian Leal ("Leal"), Tab 20 ("Def.'s Leal Dep.") at 165; Georgia apprentice funeral director/embalmer, William Ore ("Ore"), Tab 24 ("Def.'s Ore Dep.") at 99, 112; funeral director, Jack Wilkinson ("Wilkinson"), Tab 37 ("Def.'s Wilkinson Dep.") at 152-53.)

### b. On-call work

Plaintiffs allege Alderwoods maintained a corporate-wide policy of suffering or permitting employees to perform various duties while on-call, but not compensating employees for all the time they spent performing on-call work. Plaintiffs assert that opt-in testimony reflected a corporate-wide policy of not recording and compensating employees for work performed while on-call. Specifically, plaintiffs separate their claims for on-call pay into three subgroups: piecework, continuous workday, and phone calls.

First, plaintiffs contend the practice of paying a *flat rate* for piece work (e.g., removals)[8] violated FLSA requirements. See 29 C.F.R. 778.311. Plaintiffs maintain that payroll records reflected that piecework was not properly recorded or paid. (See Pls.' Resp. at 13.)

Second, plaintiffs assert that, after receiving a telephone call regarding a removal, time spent by employees preparing to perform a removal (e.g., getting dressed, making or receiving

---

requiring community work did not exist, or at the most was independently and haphazardly implemented across Alderwoods' national collection of funeral homes. See Helm v. Alderwoods Grp. Inc. (Helm II), No. 08-1184, 2011 WL 855810, at *5 (N.D. Cal. Mar. 9, 2011) (finding declarations submitted by employees not members of the class nevertheless undermined the plaintiffs' position that the defendant maintained a statewide compensation policy).
[8] "Removals" were instances where the employee was required to travel to a private residence and remove a deceased's body from the residence and transport the body to the funeral home.

additional telephone calls, traveling to the funeral home and removal site, etc.) was compensable work because it required a continuous workday.  (Id. at 14.)

Third, prior to March 2006, Alderwoods did not record or compensate employees for taking telephone calls while on-call.  (Pls.' Resp. at 16.)   Plaintiffs argue that Alderwoods instituted an after-hours call log in an attempt to comply with the FLSA.  (Id.)  Sample plaintiffs testified, however, that even after the call log, employees were only paid a flat rate of fifteen minutes per call, regardless how much time was actually spent on the call.  (Id.)

Initially, Burgess, a funeral director and embalmer, testified that when he worked beyond his scheduled hours, he would record that time, it was never questioned, and he was paid for the time recorded.  (Dep. Excerpts, Tab 1 ("Def.'s Burgess Dep.") at 112.)  Burgess stated that Alderwoods started "cracking down" on overtime when a time clock was implemented, and on-call telephone time could not be recorded.  (Id. at 137.)  Burgess clarified that prior to the time clock, Alderwoods credited employees a flat rate of three hours per removal done while on-call, and employees were only paid for three hours, even if it took longer than three hours to perform the removal.  (Pls.' Burgess Dep. at 83.)  Once Alderwoods implemented the time clock, Burgess could not record and was not compensated for on-call work performed at home (e.g., taking telephone calls, getting dressed, and traveling to the funeral home), because he could not "punch in."  (Id. at 82.)

Michael Butler ("Butler"), a funeral director and embalmer in California, explained that his supervisor told him not to submit time for performing on-call services.  (Dep. Excerpts, Tab 3 ("Def.'s Butler Dep.") at 189; Pls.' Information Sheets.)

Carswell, a funeral director, testified that Alderwoods did not compensate him for on-call work performed prior to punching the time clock.  (Pls.' Carswell Dep. at 216-17.)  Carswell

explained that Alderwoods often paid him a flat rate for performing on-call work, but the flat rate did not always reflect the amount of work he performed.  (Id. at 157.)

Steven Detschner ("Detschner"), a funeral director and embalmer, complained to management that he was not compensated for performing on-call work answering and making telephone calls outside the funeral home because employees were not permitted to record that time.  (Pls.' App., Ex. 76 ("Pls.' Detschner Dep.") at 125-26.)

Diggs, a funeral director and embalmer, maintained that Alderwoods' practice regarding piecework compensation did not reflect its written policy.  (Pls.' App., Ex. 76 ("Pls.' Diggs Dep.") at 75-77.)  Diggs explained that actual time performing piecework was not recorded because Alderwoods only paid a flat rate of $35 per removal, regardless how long it took to perform the removal.  (Id. at 76-77.)  Diggs did not attempt to record the actual time spent performing removals because he would only be compensated at the flat rate.  (Id. at 125.)

An arranger, Stephen Escobar ("Escobar"), explained that he was compensated for all time he recorded.  (Dep. Excerpts, Tab 9 ("Def.'s Escobar Dep.") at 63.)  He did not record overtime hours on the weekends because it would upset his district manager.  (Id. at 81.)  Escobar's unrecorded overtime totaled approximately sixteen hours per month.  (Id. at 84-85.)

A location administrator, Janet Garmback ("Garmback"), stated that, prior to the acquisition of Alderwoods by Service Corporation International ("SCI"), employees were paid a flat rate of $65 per removal, with no additional hourly pay.  (Pls.' App., Ex. 80 ("Pls.' Garmback Dep.") at 56-57.)  Employees received the flat rate regardless how long it took to perform the removal.  (Id. at 57.)  Removals could take five minutes or five hours and there was no average.  (Id.)  After SCI's acquisition of Alderwoods, employees were required to be compensated on an hourly basis per removal.  (Id. at 56.)

Alderwoods argues that opt-in plaintiffs' testimony support the proposition that they are not similarly situated for purposes of an FLSA collective action. The testimony differed on issues such as the type of on-call work they performed, compensation practices between funeral home locations and the relief sought. Specifically, Alderwoods asserts that opt-in testimony reflected competing or contradictory policies maintained in Alderwoods' funeral homes, including whether employees reported on-call work or whether individuals were compensated for a telephone call. (Def.'s Reply at 3.)

With respect to piecework, Collins testified that, at certain locations, piecework pay (i.e., paying employees a flat rate for on-call work rather than an hourly rate) existed, but was discontinued somewhere around 2005. (Pls.' Collins Dep. at 49-50.) Collins confirmed there was no corporate-wide policy regarding piecework, and that Alderwoods eliminated any instances of the practice at individual funeral homes. (Id. at 53 ("Piecework was a . . . funeral service legacy way of paying employees but it was never an Alderwoods policy that piecework be allowed. . . . We did a . . . location by location review of practices and where we found piecework we eliminated it.").)

An Oklahoma funeral director and embalmer, Jerry Eisenhour ("Eisenhour"), testified that, generally, he would report work performed on the telephone while on-call, and received compensation for the time he reported. (Dep. Excerpts, Tab 8 ("Def.'s Eisenhour Dep.") at 158; Def.'s App., Ex. L ("Def.'s Information Sheets").)

Prise, a Pennsylvania location manager, testified that, to the extent she performed on-call removals, she was paid for that work. (Def.'s Prise Dep. at 114.) On-call time spent on the telephone and traveling to the funeral home was unpaid. (Id.)

Rady, a Pennsylvania funeral director and embalmer, explained that before 2005, only work performed inside the funeral home was paid. (Def.'s Rady Dep. at 89-90.) Despite that general rule, on one occasion Rady performed on-call work, requested compensation for that work, and was paid for the on-call services rendered. (Id. at 69.) After July 2005, Rady recorded her on-call time and could not recall an instance where she recorded her time and was not paid. (Id. at 93-94.)

An arranger, Matthew Twiss, acknowledged that, at least in one instance, his time card reflected that he was paid for recorded on-call work. (Dep. Excerpts, Tab 34 ("Def.'s Twiss Dep.") at 178-79.) An Indiana funeral director and location manager, Raymond White ("White"), testified that he would clock in and out for on-call removals, although he believed there were hours he recorded that went uncompensated. (Dep. Excerpts, Tab 36 ("Def.'s White Dep.") at 146-47, 165; Reply Information Sheets, Tab 14.) White recalled instances where he performed on-call work without clocking in, handwrote the time on his time cards and his supervisor signed off on the time cards. (Def.'s White Dep. at 165-66.) White's supervisor advised him to record the time it took to arrive at the funeral home after receiving a telephone call, but White chose not to record that time. (Id. at 228-29.)

As a funeral director, Wilkinson lived in the funeral home in which he worked. He testified that after receiving a call regarding a removal, he would get dressed and walk downstairs, clock in, and perform the removal. (Def.'s Wilkinson Dep. at 87, 159-60.) Wilkinson was paid at his hourly rate for that recorded on-call work. (Id. at 159-60.)

### c. Overtime preapproval

Plaintiffs allege Alderwoods maintained a corporate-wide policy requiring approval for overtime, but refused to pay for all overtime worked despite suffering or permitting overtime work. Plaintiffs cite 29 C.F.R. § 785.13 for the proposition that Alderwoods was responsible for preventing employees from performing overtime, and in many instances it failed to do so and did not properly compensate those employees. "An employer who has knowledge that an employee is working and who does not desire the work to be done, has a duty to make every effort to prevent its performance." Chao v. Gotham Registry, Inc., 514 F.3d 280, 288 (2d Cir. 2008). The Court of Appeals for the Second Circuit emphasized in Chao that "[t]his duty arises even where the employer has not requested overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours." Id.; see Camesi v. University of Pittsburgh Med. Ctr., No. 09-85, 2009 WL 1361265, at *4 (W.D. Pa. May 14, 2009) (the law is clear that it is the employer's responsibility to ensure compensation for work suffered or permitted).

Plaintiffs direct the court to several memoranda and other documents for the proposition that it was Alderwoods' corporate-wide policy that overtime would be uncompensated if the employee did not obtain preapproval. (See Pls.' App., Ex. 54.)[9] Plaintiffs also rely upon sample plaintiffs' testimony to support their position that employees were affected by this corporate-

---

[9] One of the documents contains minutes from an October 8, 2003 meeting of Pittsburgh, Pennsylvania market staff, wherein Pat McDermott ("McDermott"), a market general manager, reminded the staff that all overtime must be preapproved and any overtime that was submitted without prior approval would not be paid. (Pls.' App., Ex. 54.) A second document is a memorandum dated September 16, 2002, from an individual named Scott to staff members at the Evergreen Memorial Chapel, where he states as follows: "It has always been the policy at Evergreen Memorial Chapel, and now Alderwoods Group, that no overtime be paid without prior approval and without a written explanation." (Id.) A third document concerns another memorandum dated May 19, 2003, to staff members at the Evergreen Memorial Chapel which stated, "As per policy, any overtime not approved will not be paid." (Id.) Plaintiffs attached another memorandum dated May 10, 2006 from Ken Dimond to "all location managers," which stated that "[o]nly approved overtime will be paid." (Id.) The memorandum from Ken Dimond is not helpful to plaintiffs' argument because plaintiffs failed to identify Ken Dimond's position with Alderwoods or provide the context of his memorandum to "all location managers." The memorandum, however, contains language concerning wage and hour issues at a regional level, and the court concludes that the thrust of the memorandum was limited to a particular Alderwoods' region.

16

wide policy and, therefore, the collective class is similarly situated for purposes of collective action certification.

For example, Lanza, a Washington funeral director and embalmer, testified that there were instances when he worked overtime without approval and did not receive any compensation. (Pls.' Lanza Dep. at 232.) Lanza was instructed by his supervisors at staff meetings not to clock in until his regularly scheduled workday, even though he might have been working before the start of his shift. (Id. at 233-34.)

Long, a funeral director, stated that during her employment, her supervisor would remove overtime hours from employee time cards if he believed they had too much overtime. (Pls.' Long Dep. at 63.) Long attended a conference call during which a member of management, Craig Duke ("Duke"), stated it was policy that no overtime was to be paid if it was not preapproved. (Id. at 72-73.)[10]

McDonald, a Texas funeral director and embalmer, would seek overtime preapproval from her supervisor for embalmings and removals, but her supervisor never approved her overtime. (Pls.' McDonald Dep. at 109, 114.) Despite her supervisor's refusal to authorize overtime, McDonald continued to perform overtime work because, as she explained, "somebody was dead, and I had to go embalm them, or . . . you know, my job was to do that." (Id. at 114-15.)

A Pennsylvania funeral director and embalmer, John Peters ("Peters"), explained that there were occasions when he worked overtime and was not paid, even though the overtime had been approved. (Dep. Excerpts, Tab 25 ("Def.'s Peters Dep.") at 104; Reply Information Sheets, Tab 10.)

---

[10] It is unclear from the record the type of "management" position Duke held. For example, plaintiffs did not indicate whether Duke was Long's immediate supervisor or a corporate officer.

A market growth manager in Pennsylvania, Robert Pramik ("Pramik"), testified that he had seen a written Alderwoods' policy stating that employees were not to receive compensation for working overtime if the work was not preapproved. (Pls.' App., Ex. 99 ("Pls.' Pramik Dep.") at 186; Pramik Decl. (ECF No. 117), Ex. 3.) Pramik opined that the policy applied to all Alderwoods' hourly employees, and during his tenure as a manager, he recalled occasions when he denied individuals overtime compensation if it was not preapproved. (Id. at 187-88.) Pramik admitted that, in those instances, he removed overtime from time cards before they were processed by payroll. (Id. at 193-94.)

Prise, a Pennsylvania location manager, explained that she was required to work overtime on a weekly basis throughout her employment at Alderwoods and she was not compensated for her overtime if it was not preapproved. (Pls.' App., Ex. 100 ("Pls.' Prise Dep."), Part II at 54.) Certain individuals from different management levels at Alderwoods, including Collins, a vice president of operations; McDermott, a market general manager; Leahy, a regional general manager; George Amato, a regional general manager; and Michael Hilgefort, a location manager, told Prise she could not put unapproved overtime on her time card, and she estimated this applied to a couple hours of overtime per week. (Id. at 56, 79; Pls.' App., Ex. 54.)

A Michigan funeral director and embalmer, John Schabloski ("Schabloski"), testified that, if he failed to seek preapproval for overtime work, his manager would surreptitiously alter his time card to reflect less overtime, and he received compensation for the lower amount. (Pls.' App., Ex. 103 ("Pls.' Schabloski Dep.") at 59, 61; Pls.' Information Sheets.) Sometime in 2004 or 2005, Schabloski's manager stated that she would not pay him overtime if it was not preapproved. (Id. at 178-79.)

Alderwoods contends that sample plaintiffs' testimony differed regarding whether employees were required to obtain preapproval to work overtime, and the types of compensation practices they experienced concerning overtime preapproval. (Def.'s Mot. at 8.) Alderwoods maintains that the different policies between locations and the individualized implementation of an overtime preapproval policy indicates that the class is not similarly situated. Alderwoods argues that the emails plaintiffs rely upon for their overtime preapproval claim are not representative of corporate policy; rather, they reflect the comments of managers responding to isolated incidents occurring at individual funeral homes. (Hr'g Tr. at 74.)

Burgess, a funeral director and embalmer, explained that, in his experience, three possible scenarios occurred regarding overtime. First, there were instances where he worked overtime without preapproval and received compensation. (Def.'s Burgess Dep. at 112.) Second, Burgess worked overtime without preapproval and the work was questioned, but was eventually paid. (Id. at 113-14.) Third, there were occasions where Burgess worked overtime without preapproval, the time was questioned and subsequently marked off (i.e., the overtime was uncompensated). (Id. at 115.)

Detschner, a funeral director and embalmer, testified that for certain overtime work (e.g., removals), there were standard blocks of time used to record the work performed, and no preapproval of that work was necessary. (Dep. Excerpts, Tab 6 ("Def.'s Detschner Dep.") at 149.) Detschner explained that a standard removal and embalming took three hours, but if he took longer to perform those services and his manager agreed with the explanation, he would be compensated for the additional time despite working additional overtime without preapproval. (Id. at 150.)

Diggs, a funeral director and embalmer in Alaska, maintained that he was not required to seek preapproval to work overtime, he worked overtime without preapproval and he was paid for that time. (Def.'s Diggs Dep. at 130-31, 142.) Other sample plaintiffs similarly testified that they were not required to obtain preapproval to work overtime, received compensation for overtime without preapproval, or received partial payment for working overtime without preapproval. (See, e.g., Def.'s Rady Dep. at 163 (a Pennsylvania funeral director and embalmer); location administrator Janet Garmback ("Garmback"), Tab 11 ("Def.'s Garmback Dep.") at 42, 75; Schabloski, Tab 30 ("Def.'s Schabloski Dep.") at 59-60 (a Michigan funeral director and embalmer); Def.'s Twiss Dep. at 101 (an arranger).)

Certain management-level personnel testified that Alderwoods did not maintain a corporate-wide policy that refused compensation to hourly nonexempt employees who did not obtain preapproval to work overtime.[11] For example, Bath explained that if an employee performed and reported overtime work, he or she would be compensated for the work regardless whether it was preapproved. (Manager Dep. Excerpts, Tab 2 ("Def.'s Bath Dep.") at 264; see Def.'s Hensley Dep. at 122, 124.)

### d. Training for insurance licenses

Plaintiffs allege Alderwoods maintained a corporate-wide policy requiring hourly employees to train for and become licensed insurance agents. Plaintiffs contend that despite this requirement, Alderwoods did not compensate employees for the time spent training, taking tests and fulfilling continuing education requirements in furtherance of becoming licensed insurance agents. Plaintiffs argue the deposition testimony reflects employees were required to obtain an

---

[11] It is unclear from the testimony of the management deponents which management positions they held as Alderwoods' employees.

insurance license, and any contradictory testimony defendant relies upon is irrelevant because those individuals are not claiming this violation.  (Pls.' Resp. at 22.)

Collins testified that Alderwoods reimbursed employees' licensure fees incurred from obtaining an insurance license, but Alderwoods did not pay employees for time spent taking the course to prepare for the insurance license exam.  (Pls.' Collins Dep. at 282-83.)

Stephen Takesian ("Takesian"), an Arizona family service counselor and assistant funeral director, explained that prior to his employment with Alderwoods, he was told that he needed to obtain his insurance license.  (Pls.' App., Ex. 105 ("Pls.' Takesian Dep.") at 218-19; Reply Information Sheets, Tab 12.)  Takesian spent approximately twenty-four hours (twelve hours in class, twelve hours studying) outside the funeral home preparing for the insurance exam.  (Id. at 219-20.)  Takesian took the class twice, took the exam three times, and failed the exam each time.  (Id. at 125.)  Takesian requested compensation for the time spent preparing for the exam, but management explained he would not be compensated unless he passed the exam.  (Id. at 125-26.)

Prise testified that she was told in a meeting with McDermott, a market general manager, that all Pennsylvania funeral directors were required to obtain a life insurance license.  (Pls.' Prise Dep. at 127-28.)  Prise explained that McDermott communicated to her this requirement was a corporate-wide policy that would be pursued at each location.  (Id. at 138.)

 Pramik, a Pennsylvania market growth manager, testified that funeral directors were required to obtain an insurance license, and that requirement was reinforced by Amato, a regional general manager, as well as an individual named Ted Reese ("Reese").[12]  (Pls.' Pramik Dep. at 156-57, 168.)  Amato and Reese told Pramik that it was Alderwoods' policy not to compensate employees for time spent in pursuit of their insurance license outside normal

---

[12] Plaintiffs did not indicate Reese's employment position.

business hours.  (Id. at 180-81.)  Furthermore, Pramik admitted he knew of multiple hourly employees in his market who were not compensated for time spent on insurance license continuing education outside normal business hours.  (Id. at 223-24.)

In 2003 or 2004, Peters, a Pennsylvania funeral director and embalmer, was required to take the preparation course and examination for his insurance license, and if he did not follow through with that requirement, he would be "relieved of [his] duties" at the funeral home.  (Pls.' App., Ex. 97 ("Pls.' Peters Dep.") at 14-15.)  Other funeral directors at Peters' location were required to take the insurance license exam.  (Id. at 121.)  Peters reported his hours spent taking the one-day preparation course, but never received compensation for that reported time, even after he pursued compensation from Reese and Pramik, a Pennsylvania market growth manager. (Id. at 126-28.)  Peters did not take the exam on that occasion because he did not feel ready to take the test.  (Id. at 126.)

Alderwoods argues it did not maintain a corporate-wide policy requiring plaintiffs to obtain an insurance license.  (See Def.'s Reply at 8.)  Alderwoods asserts that sample plaintiffs' testimony varied with respect to whether Alderwoods required employees to obtain an insurance license, which positions, if any, required that an insurance license be obtained, and compensation practices related to obtaining an insurance license.  (Def.'s Mot. at 9.)  Moreover, the insurance licensure requirements varied from state to state, which requires an individualized inquiry regarding those requirements in each state.  (Hr'g Tr. at 75-76.)  For those reasons, Alderwoods contends that plaintiffs are not similarly situated.

White, an Indiana funeral director and location manager, testified that "upper management"[13] did not want funeral directors selling preneed insurance, and that he never sold preneed contracts during his employment with Alderwoods.  (Def.'s White Dep. at 139.)

Eisenhour, an Oklahoma funeral director and embalmer, admitted he was compensated for the time dedicated to taking continuing education courses for his insurance license.  (Def.'s Eisenhour Dep. at 165.)  Eisenhour concluded he does not have a claim in this lawsuit against Alderwoods for compensation related to any time spent concerning his insurance agent license. (Id.)

Rady, a Pennsylvania funeral director and embalmer, testified that she requested, but never received, reimbursement for time spent in taking continuing education courses to maintain her insurance license.  (Pls.' App., Ex. 101 ("Pls.' Rady Dep.") at 126-29.)  Rady recalled her supervisor stating that, by a certain time, all funeral directors should have had their insurance license.  (Id. at 118.)  To her knowledge, no funeral directors were terminated for failing to obtain an insurance license.  (Id. at 120.)

Burgess, a funeral director and embalmer, testified he was initially informed that he was required to obtain an insurance license.  (Def.'s Burgess Dep. at 306.)  After questioning the requirement, it was explained that obtaining the license was recommended.  Burgess was not compensated for the time spent on the preparation classes for the license.  (Id. at 307.)  Burgess maintains that he is owed compensation for eight hours of continuing education for his insurance license that Alderwoods refused to pay.  (Pls.' Burgess Dep. at 231.)

Several sample plaintiffs in different employment positions, such as funeral director, embalmer, apprentice funeral director/embalmer and arranger, testified that employees were not required to and did not sell insurance at their funeral home locations.  (See, e.g., Dep. Excerpts,

---

[13] White's deposition testimony did not indicate what he meant by "upper management."

Tab 19 ("Def.'s Lanza Dep.") at 234 (a Washington funeral director and embalmer); Tab 21 ("Def.'s Long Dep.") at 29, 38 (funeral director); Def.'s Ore Dep. at 32 (a Georgia apprentice funeral director and embalmer); Def.'s Schabloski Dep. at 40, 42 (a Michigan funeral director and embalmer); Def.'s Twiss Dep. at 43 (an arranger); Def.'s Wilkinson Dep. at 33-34 (a funeral director).)

Bath testified that if an employee worked on his or her continuing education hours for an insurance license away from the funeral home and outside the regular workday, then it was not paid for by Alderwoods. (Pls.' Bath Dep. at 296-97.) Bath noted, however, that obtaining an insurance license was not a job requirement. (Id.)


### e. Employee meal breaks[14]

Plaintiffs allege that Alderwoods maintained a corporate-wide policy whereby employees were suffered or permitted to perform work during their meal breaks causing them to be denied an uninterrupted thirty-minute bona fide meal period as well as proper compensation for interrupted meal breaks. (Pls.' Resp. at 17.) Plaintiffs propose that deposition testimony, including testimony from Alderwoods' Rule 30(b)(6) witness, Collins, confirmed that it was Alderwoods' policy to only compensate employees for the portion of their meal breaks during which they were interrupted to perform services for the company. (Id.) Plaintiffs argue that the FLSA requires employers to compensate employees for an entire meal break if the employer does not provide a bona fide meal break. An employee does not receive a bona fide meal break "if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating." 29 C.F.R. § 785.19(a); see generally Oakes v.

_____

[14] Neither party provided any deposition testimony from Prise with respect to the meal break policy.

Pennsylvania, 871 F. Supp. 797, 799-800 (M.D. Pa. 1995) (employing the "predominately for the benefit of the employer" test to meal breaks to determine whether the plaintiffs' thirty-minute meal breaks were compensable).

Plaintiffs rely upon an email dated April 24, 2006, sent from an individual named Chuck Gibson to Collins and Leahy as evidence of a corporate-wide policy that required employees to work through their lunch period even though the work was off the clock. (See Pls.' App., Ex. 53.)[15] Collins testified that, hypothetically, an employee who was required to take a telephone

---

[15] This email is noteworthy for what it did not say – that employees were required to work through their meal breaks *uncompensated*. The email provided in relevant part:

> The most difficult to manage feature of our new Hours of Work policy is proving to be the requirement for an unpaid lunch, during which no work is to be performed.
>
> On many occasions, in our small locations, particularly cemeteries, the office is manned by only one person. [I]n order to follow the Hours of Work Policy, LAs must lock the door and not answer the phone for 30 minutes during the middle of the day. Many are very reluctant to do this, as it contradicts our Company's pledge to always put service to families first. Others are clocking out, but continuing to work while eating lunch. This violates the policy language that states that employees must not perform work for the company during the meal period. As a result, we have employees who feel they must make a choice between (a) failing to honor our commitment to families or (b) failing to abide by a Company policy.
>
> In larger locations, midday (the traditional meal break time) is often a very busy time as employees are either preparing for or conducting services. So, many have traditionally often grabbed something to eat "on the fly" in order to continue their assigned duties with as little interruption as possible. This seems to be an accepted part of the job in our business and is often absolutely necessary if we are to effectively serve families. This often resulted in the employee choosing to then leave work early at the end of that shift – but this is prohibited under the new policy.
>
> In general, the new policy has taken flexibility away from management. For instance, as stated, the employee who didn't have time to actually take a lunch could, in the past, leave before the end of the shift, having already completed eight hours work. This suited the employee and the manager as well. After all, if all the duties of the day were accomplished, why must the employee (having already worked eight hours) sit around and wait for [sic] shift end? Now, that employee make [sic] actually log overtime for that day.
>
> Granted, the policy allows management to waive or delay meal periods on "an emergency basis". [sic] But, the circumstances our managers describe aren't "emergencies" – they are daily requirements of our business.

call for one minute while on his thirty-minute meal break would receive compensation for working one minute. (Pls.' Collins Dep. at 67-69.) Two vice presidents of operations, Buddy Mayes ("Mayes") and Shawn Phillips ("Phillips"), respectively confirmed that Alderwoods' policy was for the employee to clock in for work performed during their meal break and the employee would receive compensation for the interrupted portion of their meal break. (Pls.' App., Ex. 93 ("Pls.' Mayes Dep.") at 39-40; Ex. 98 ("Pls.' Phillips Dep.") at 106-07.)

A Kansas location administrator, Angela Keath ("Keath"), stated that employees were required to clock out for lunch on their time cards regardless whether they were able to take their lunch break. (Pls.' App., Ex. 88 ("Pls.' Keath Dep.") at 49; Reply Information Sheets, Tab 6.) Keath's supervisors directed her to sign her time cards reflecting that a meal break was taken, even when her meal break was interrupted or she did not have time to take it. (Pls.' Keath Dep. at 74.)

Keath explained that her manager would automatically deduct two-and-a-half hours of working time from her time cards to reflect that meal breaks were taken each week, even when she worked through her meal breaks. (Id. at 135-37.) Keath explained the demands of working at an Alderwoods' funeral home with respect to meal breaks:

> [I]n our industry it's not as easy as, I clock in at 8:00, I go to my desk, I clock out at lunch, come back in, work till 5:00, you are not sitting at your desk working all day. There are . . . you are out of

---

Our managers fully understand the need to document hours worked in accordance with wage and hour laws. However, some feel that rather than merely documenting what we accomplish operationally, the policy requires us to adapt our operations to meet the documentation procedures.

In general, I believe that our managers would like to have the flexibility they feel they need on this issue – while still fulfilling the legal requirements of wage and hour recording. This could be accomplished by amending the policy to recommend unpaid meal periods, while allowing more managerial discretion in directing them.

(Pls.' App., Ex. 53.)

> the office a lot. I went on, you know, to work a lot of services. And if I didn't go to work the services I'm the only one there, everybody else is gone working services. It was impossible to clock out to leave for lunch, so I had to eat my lunch at my desk. You have to answer the phones when they are ringing when you are the only one there. More often than not, I would be the only one there.

(Id. at 196-97.) Keath witnessed her manager deduct reported time worked through meal breaks on the time cards of other employees. (Id. at 206.)

Long, a funeral director, understood employees were to reflect that a one-half-hour lunch was taken each day, regardless whether the lunch break was actually taken. (Pls.' Long Dep. at 120-21.) Long's supervisor was aware that her time card inaccurately reflected lunch taken, because he observed Long working through lunch breaks on a regular basis. (Id. at 115, 120-21.) Factors that determined whether Long could take a lunch break included telephone calls, whether any other employees were in the funeral home, whether a funeral ran through lunch, or a customer unexpectedly arrived at the funeral home requesting services from the employees. (Def.'s Long Dep. at 201-02.)

Pramik, a Pennsylvania market growth manager, explained that Alderwoods' meal break policy was to ensure a thirty-minute meal break was reflected on the time cards of each employee, regardless whether they worked through the meal break. (Pls.' Pramik Dep. at 201-02.) Many days employees were required to work through their meal breaks, but they did not receive compensation for that time because the records were doctored to reflect a meal break was taken. (Id. at 203-04.) Pramik was pressured from his supervisors to reduce overtime compensation, and working through meal breaks was an area that increased overtime. (Id. at 210-11.) Pramik explained that he did not compensate employees for time spent working

through lunch, because he was enforcing a directive from Amato, a regional general manager. (Id. at 367-68.)

Alderwoods argues that sample plaintiffs' testimony differed on issues such as whether employees worked through meal breaks and the kinds of compensation, if any, they received for working through meal breaks. (Def.'s Mot. at 11.) Specifically, Alderwoods asserts that sample plaintiffs were not able to articulate a common meal break practice because their testimony reflected two mutually exclusive compensation practices – they asserted that they were only paid for the interrupted portion of their meal break, and they also asserted that they were not paid for any interrupted portion of their meal break. (Def.'s Reply at 8.)

Alderwoods' written policy on meal periods provided in pertinent part:

> Hourly employees who work more than five consecutive hours in a day are allowed an unpaid meal period of no less than 30 minutes and no more than one hour. For employees working split shifts, the unpaid meal period will occur between the shifts and may be more than a one hour period. The scheduling of meal periods is approved by management to satisfy operational/business needs. On an emergency basis, meal periods may be waived or delayed at the directions of management in order to meet business needs.

> Employees must clock out at the beginning of their meal period, and clock in at its conclusion. Employees may not waive their meal period in order to start work later or leave work earlier under any circumstances. *During the meal period, an employee is not to perform work for the Company.*

> . . . .

(McGee Aff. (ECF No. 1584), Ex. JJ at ALD025455 (emphasis added).)

Lanza, a Washington funeral director and embalmer, stated that if he did not take a lunch break, he would indicate he worked an extra one-half hour on his time card, and he was compensated for that time. (Def.'s Lanza Dep. at 51-52, 171.) Similarly, a location manager, Barry Miles ("Miles"), testified that if he made a notation on his time card that he worked

through his meal break, he was compensated for that time. (Dep. Excerpts, Tab 23 ("Def.'s Miles Dep.") at 286.)

Rady, a Pennsylvania funeral director and embalmer, testified that she initially received paid meal breaks (e.g., for an 8:00 a.m. to 4:00 p.m. shift, Rady was compensated for eight hours, including her meal break), but at some point she no longer received paid meal breaks. (Def.'s Rady Dep. at 36.) When circumstances did not permit taking an uninterrupted meal break, Rady wrote "no lunch" on her timesheet and her supervisor initialed her notation, which indicated it was "okay" she did not take a lunch that day. (Id. at 104-05.)

An apprentice funeral director and embalmer, Adrian Leal ("Leal"), initially testified that he did not receive compensation for missed meal periods, even when that time was properly recorded on his time card. (Pls.' App., Ex. 91 ("Pls.' Leal Dep.") at 78, 141-42.) On one occasion, however, Leal explained that he was compensated for working through a meal break when he recorded "no lunch" on his time card. (Dep. Excerpts, Tab 20 ("Def.'s Leal Dep.") at 136.) On two other occasions, Leal persisted by requesting he receive compensation for missed meal periods, and he received partial payment for one meal break, and full payment for another. (Id. at 75-77.)

William Ore ("Ore"), an apprentice funeral director and embalmer in Georgia, stated that on some occasions he would write "no lunch" on his time card and would receive compensation, while on other occasions he would not receive compensation for working through his lunch break. (Def.'s Ore Dep. at 150; Pls.' Information Sheets.) Ore also testified about instances when he would not punch out for lunch because he was required to work, but his supervisor would change his time card to reflect that he took a thirty-minute lunch. (Pls.' App., Ex. 96

("Pls.' Ore Dep.") at 57-58.)  Ore testified that he worked through his lunch period two to three times per week.  (<u>Id.</u> at 214.)

A location administrator, Arlene Sprague ("Sprague"), was instructed to put "no lunch" on her time card to either reflect instances when she worked through part of her lunch break or through her entire lunch break, and she was compensated for that time.  (Dep. Excerpts, Tab 31 ("Def.'s Sprague Dep.") at 199-200.)

Management deponents maintained that if employees reported on their time cards the time they spent working through meal breaks, they were compensated for that time.  (Def.'s Bath Dep. at 109-10; Def.'s Hensley Dep. at 89-91.)  This practice paralleled Alderwoods' policy, and management communicated the policy to location managers.  (Def.'s Hensely Dep. at 138-39.)

### IV. Legal standards

Pursuant to 29 U.S.C. § 216(b) of the FLSA, potential plaintiffs must opt into a collective action suit and "affirmatively notify the court of their intentions to join the suit."  <u>Asencio v. Tyson Foods, Inc.</u>, 130 F. Supp. 2d 660, 662 (E.D. Pa. 2001) (citing <u>Sperling v. Hoffman-La Roche, Inc.</u>, 862 F.2d 439, 444 (3d Cir. 1988)).   In order to proceed as a representative action under § 216(b), the representative plaintiffs must show that the potential plaintiffs are "similarly situated" to the representative plaintiffs and that each absent collective action member filed a consent to join the action.  <u>Id.</u>

The Court of Appeals for the Third Circuit and the Supreme Court of the United States do not provide a framework for conducting a "similarly situated" analysis under § 216(b); district courts within the Third Circuit, however, have developed a two-tier method for determining whether plaintiffs are "similarly situated."  <u>Villanueva-Bazaldua v. TruGreen Ltd. Partners</u>, 479

F. Supp. 2d 411, 414 (D. Del. 2007). The first tier is the "notice phase" which begins when the named plaintiff seeks authorization to issue notice to other prospective class members. Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000). Notice usually occurs at an early stage of the proceedings and the court determines the viability of a possible collective class based on the claim and affidavits submitted in support thereof. Id.; TruGreen, 479 F. Supp. 2d at 415 ("Courts generally examine the pleadings and affidavits of the parties to decide whether notice is appropriate."). At the first tier, the plaintiff has a fairly low burden of proving the similarly-situated requirement. Asencio, 130 F. Supp. 2d at 663. Indeed, a court may conditionally certify the class for purposes of notice and discovery under a comparatively liberal standard, i.e., by determining that the members of the putative class "were together the victims of a single decision, policy or plan . . . ." Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 407 (D.N.J.), aff'd, 862 F.2d 439 (3d Cir. 1988), aff'd, 493 U.S. 165 (1989).

The second tier occurs when all putative class members have filed their consents to opt into the collective action and further discovery has taken place to support the plaintiff's assertions that the defendant violated the FLSA and the matter is ready for trial. Mueller v. CBS, Inc. (Mueller I), 201 F.R.D. 425, 428 (W.D. Pa. 2001). At this stage, "'the court will again make a certification decision based on the 'similarly situated' standard, but will require a higher level of proof than was necessary at the first stage for conditional certification.'" Lugo v. Farmer's Pride, Inc., 737 F. Supp. 2d 291, 299 (E.D. Pa. 2010) (quoting Lugo v. Farmer's Pride, Inc., No. 07-749, 2008 WL 638237, at *3 (E.D. Pa. Mar. 7, 2008)). While the court uses a significantly higher standard to analyze the similarly situated issue at the decertification stage, it is not necessary for putative class members to be identical. Moss v. Crawford & Co., 201 F.R.D. 398, 409 (W.D. Pa. 2000); see Andrako v. U.S. Steel Corp., No. 07-1629, 2011 WL 855341, at *4

(W.D. Pa. Mar. 9, 2011). "If the conditional group of plaintiffs does not meet this standard at the second stage, the group is decertified, the opt-in plaintiffs are dismissed without prejudice and any remaining plaintiffs are permitted to move onto the trial stage of litigation." Id. The burden stays with the plaintiff at each stage to demonstrate that other employees are similarly situated. Id.

The court reconsiders the class certification question after conducting a fact-specific review of each class member who has opted-in, taking into account factors such as employment setting, termination procedures, defenses asserted against various plaintiffs, and other procedural issues. Mueller I, 201 F.R.D. at 428. Specifically, to determine whether a "similarly situated" finding is proper under § 216(b), the court must review "'(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.'" Lugo, 737 F. Supp. 2d at 300 (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)).

The first factor considers opt-in plaintiffs' job duties, geographic location, supervision and salary. Mueller v. CBS, Inc. (Mueller II), No. 99-1310, at *20 (W.D. Pa. Dec. 9, 2002) (Def.'s App., Ex. M).[16] The similarities between the named and potential plaintiffs under the first prong "must extend 'beyond the mere facts of job duties and pay provisions.'" Zavala v. Wal-Mart Stores, Inc., No. 03-5309, 2010 WL 2652510, at *3 (D.N.J. June 25, 2010) (quoting Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007)). "[A]llegations of an 'overarching' policy are insufficient, and plaintiffs are required to produce "'substantial

---

[16] Mueller II is an unreported case and is unavailable on the Westlaw database. Defendant provided a courtesy copy of the decision to the court which will serve as the court's reference when the decision is cited in this memorandum opinion.

evidence'' of a ''single decision, policy or plan.'''" Moss, 201 F.R.D. at 409-10 (quoting

Thiessen v. Gen. Elec. Capital Corp., 996 F. Supp. 1071, 1081 (D. Kan. 1998)).

The second factor addresses whether "the potential defenses pertain to the opt-in class as

a whole or whether many different defenses will be raised with respect to each individual opt-in

plaintiff." Id. at 410. Individualized defenses prevent efficient representative proceedings and

courts have not hesitated to grant decertification on that basis. See id. The court may exercise

its discretion to determine whether individual defenses make a collective action unmanageable.

Id.

The third factor directs the court to consider "whether it can analyze the opt-in class with

a 'broad scale approach.'" Id. (quoting Lusardi v. Xerox Corp., 118 F.R.D. 351, 360 (D.N.J.

1987)).

> The court should consider that the primary objectives of a § 216(b)
> collective action are: (1) to lower costs to the plaintiffs through the
> pooling of resources; and (2) to limit the controversy to one
> proceeding which efficiently resolves common issues of law and
> fact that arose from the same alleged activity.

Id. The court must also consider whether any party will suffer prejudice if the action proceeds to

trial on a representative basis. Id.

While the court must refrain from conducting a preliminary inquiry into the merits of the

asserted claims in determining whether to proceed with a collective action, Mueller II, No. 99-

1310, at *41, an individual opt-in plaintiff is required to demonstrate his own basis for a reward.

Lusardi, 118 F.R.D. at 374. To that end, the Court of Appeals for the Third Circuit in Dillon v.

Coles, 746 F.2d 998 (3d Cir. 1984), instructed that

> [i]t is misleading to speak of the additional proof required by an
> individual class member for relief as being part of the damages
> phase; that evidence is actually an element of the liability portion

> of the case. Until the individual has demonstrated *actual* injury to himself, the court may not direct individual relief.

Id. at 1004 (emphasis added).

Despite the differences between the FLSA collective action and the more common Federal Rule of Civil Procedure 23 class action, "[t]he various inquiries concerning a Rule 23 class, however, while not controlling or even required to be considered, are instructive and lend useful guidance in considering the similarly situated requirement of a section 216(b) class." Lusardi, 118 F.R.D. at 358 n.18; see TruGreen, 479 F. Supp. 2d at 417 n.1; see also Mueller II, No. 99-1310, at *41 ("When determining [FLSA collective action] certification under the ADEA, I am obliged to conduct a 'rigorous analysis' comparable to that which applies to consideration of classes certified under Rule 23 to address illegal gender, race or disability discrimination."). In Lusardi v. Lechner, 855 F.2d 1062 (3d Cir. 1988), the Court of Appeals for the Third Circuit recognized that "[t]he essential difference between a Rule 23 and a FLSA class action is that the former includes all class members, present or absent, who do not 'opt-out,' while the latter requires class members to affirmatively 'opt-in.'" Id. at 1068 n.8. In light of this discreet procedural difference, the court of appeals concluded that "Rule 23 cases can be examined by analogy" in the context of an FLSA collective action. Id. at 1074 n.15.

While some courts outside the Third Circuit view the similarly situated analysis under § 216(b) as "considerably less stringent" than the requirements of Rule 23(b)(3), Heagney v. European Am. Bank, 122 F.R.D. 125, 127 n.2 (E.D.N.Y. 1988), other courts have applied Rule 23 to the extent the rule's requirements are consistent with the FLSA. See Shushan v. University of Colorado at Boulder, 132 F.R.D. 263, 265 (D. Colo. 1990) (a § 216(b) collective action "must satisfy all of the requirements of Rule 23, insofar as those requirements are consistent with 29 U.S.C. § 216(b)"); see also 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY

KANE, FEDERAL PRACTICE AND PROCEDURE § 1807 (3d ed. 2005); but see Goldman v. RadioShack Corp., No. 03-32, 2006 WL 336020, at *6 (E.D. Pa. Jan. 23, 2006) (noting Rule 23 factors "do not apply to collective actions").

## *V. Discussion*

Plaintiffs maintain that they have satisfied § 216(b)'s similarly situated requirement for each of the five compensation policies in this case. Plaintiffs primarily rely upon their own statements in deposition testimony regarding Alderwoods' pay policies in an attempt to meet their burden to show they are similarly situated. They assert that the pay policies were implemented on a corporate-wide basis, evidenced by, *inter alia*, the testimony of Collins and the contents of corporate documents. Plaintiffs argue this constitutes substantial evidence of a single nationwide decision, policy or plan and therefore their claims must be adjudicated on a collective basis.

Alderwoods responds that plaintiffs failed to meet their burden to demonstrate they are similarly situated for each of the five pay policies. It argues that there is no substantial evidence Alderwoods implemented a single corporate-wide decision, policy or plan to violate the FLSA; rather, the record demonstrates that, at best, the five pay policies at issue were implemented in an ad hoc, decentralized manner depending upon the individualized circumstances at each funeral home location and the management practices at that location. Alderwoods notes that sample plaintiffs cannot agree on fundamental issues for each pay policy, such as whether they received compensation, the reporting requirements concerning specific job duties, and the time periods that the alleged pay policies were in effect.[17] Because the disparate factual and employment

---

[17] Alderwoods raises statute of limitations and equitable tolling issues as defenses to liability and additional impediments to collective action certification. Sample plaintiffs' testimony indicated that Alderwoods'

settings, individualized defenses, and fairness to the parties would necessitate 721 mini-trials, Alderwoods concludes that proceeding with a collective action in this case would be improper and prejudicial. The court finds defendant's position to be persuasive, and plaintiffs failed to satisfy their burden to show they are similarly situated with respect to the five compensation policies.[18]

As a threshold matter, the court cannot ignore the recent decisions in Helm v. Alderwoods Grp. Inc. (Helm I), No. 08-1184, 2009 WL 5206207 (N.D. Cal. Dec. 29, 2009), and Helm II. The facts relevant to those decisions are substantially similar to the facts of this case. It is noteworthy that the claims in the Helm lawsuit were originally part of this action. See Helm I, 2009 WL 5206207, at *1. All the pay policies present in this case were included in Helm, and similar testimony, exhibits and arguments were submitted to the court in Helm and this court. The court in Helm, however, considered the requirements to satisfy a Rule 23 class action, and conducted its analysis of the plaintiffs' claims under those standards. In Helm I, the court denied the plaintiffs' motion for class certification, and later denied the plaintiffs' renewed motion in Helm II. While this action requires a "similarly situated" analysis under § 216(b), the applicable standards here and in Helm are not mutually exclusive. The court, therefore, may consider the rationales of the Helm decisions.

There are two germane decisions from the Western District of Pennsylvania – Mueller II and Andrako – that serve as "bookends" for the court's decision. In Mueller II, the court dealt

---

[18] There is a general lack of cohesiveness regarding plaintiffs' employment positions. It is unclear, for example, whether some policy subclasses were more applicable to particular employment positions. Plaintiffs failed to tailor each subclass to encompass the relevant positions, which further complicates certification and undermines plaintiffs' position that they are similarly situated.

The footnote continues from previous page: compensation policies evolved over time and it is unclear to the court when those changes to compensation practices occurred. In light of that testimony, an individual inquiry of opt-in plaintiffs may be necessary to determine the applicable time period for each compensation policy and whether a particular plaintiff would be barred from recovery by the statute of limitations or the doctrine of equitable tolling. Such an inquiry illustrates the difficulties plaintiffs face in their attempt to meet their burden to demonstrate collective action certification is proper.

with a motion for decertification of a conditionally certified collective action under the FLSA in the context of violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*. The court considered two subclasses related to the defendant's alleged age discrimination decisions and concluded the subclasses totaling over 3,500 opt-in plaintiffs were not fit for the FLSA's collective action mechanism. The defendant noted that subclass I included former employees from approximately 59 divisions and 197 plants located in 35 states. Mueller II, No. 99-1310, at *42. Tellingly, the plaintiffs identified inconsistent reasons for their termination from employment irrespective of their age. Id. at 43.

The plaintiffs acknowledged the disparities amongst themselves, but asserted the defendant's overarching corporate-wide policy to terminate the employment of older employees was sufficient to overcome the disparities to meet their similarly situated showing. Id. at 45. The plaintiffs attempted to demonstrate a corporate-wide policy of age discrimination by identifying corporate documents and statements made by the defendant's chairman at "chairman initiative meetings" that indicated the company intended to implement a program to eliminate older "blockers" from management positions to make way for promising young talent. Id. at 45-46. The court found the plaintiffs' position unpersuasive because the record did not demonstrate substantial evidence of "a corporate-wide policy to develop younger individuals at the price of terminating the employment of older individuals." Id. at 47. The court's conclusion was influenced in part by the disparities in the plaintiffs' deposition testimony regarding the extent to which the alleged discriminatory policy affected the class on a uniform basis. Id. at 48.

On the other end of the bookshelf sits the recent Andrako decision. In that case, the court dealt with a motion to decertify a FLSA collective action which sought compensation for time the plaintiffs spent walking to and from their workstations after donning and doffing certain

protective clothing.  <u>Andrako</u>, 2011 WL 855341, at *1.  The class was limited to 254 opt-in hourly employees at a Clairton, Pennsylvania coke manufacturing plant owned and operated by the defendant United States Steel who "were required to walk from the locker rooms to the plant after changing into their work clothes and walk to the locker rooms at the end of the work day to change out of their work clothes and shower."  <u>Id.</u> at **1-3.

Unlike <u>Mueller II</u>, the court in <u>Andrako</u> found substantial evidence of a single corporate decision, policy or plan that impacted the plaintiffs.  Since 1947 the parties had agreed the defendant "would not pay employees for preparatory and closing activities such as donning, doffing, and walking to and from work locations that occurred outside of the scheduled shift or away from the worksite."  <u>Id.</u>  The court held the class members were similarly situated in part because of the defendant's uniform policy:  "[I]t is undisputed that Defendant's longstanding policy is *not* to pay employees for the walking time at issue in this case – i.e., *pre-* and *post*-shift walking time.  The evidence before me does not show that Plaintiffs' walking time universally fell within shift time or otherwise was fully compensated."  <u>Id.</u> at *6

The court also found the plaintiffs' shared many similarities which indicated the class was amenable to collective treatment.  For example, all the plaintiffs were hourly employees who worked at a single coke plant and were required to wear the particular protective clothing at issue.  <u>Id.</u> at *7.  Generally, all the plaintiffs practiced the same donning and doffing routines at the beginning and end of the working day.  <u>Id.</u>  All the plaintiffs were represented by the same labor union and were subject to the same longstanding agreement for uncompensated walking time.  <u>Id.</u>  Lastly, all the plaintiffs "advance[d] the same claim for relief – payment for that uncompensated walking time."  <u>Id.</u>

With the <u>Mueller II</u>, <u>Andrako</u> and <u>Helm</u> decisions in mind, the court will consider whether plaintiffs in each of the five compensations classes are substantially similar by applying the three factors requisite for a showing of "similarly situated" under § 216(b): (1) factual and employment settings; (2) various defenses available; and (3) fairness and procedural considerations.

### A. Community work

### 1. First factor – factual and employment setting of individual plaintiffs

As an initial observation, plaintiffs' modification of the community work definition is problematic for certification at this juncture. The opt-in plaintiffs, who alleged a violation of this policy, were not provided the opportunity to indicate whether the policy specifically applied to after-hours community work. In other words, the court cannot ascertain whether all, some or none of the 721 opt-ins have a claim for a community work violation under the revised definition. This issue creates a possible conflict among the opt-in plaintiffs and undermines plaintiffs' ability to meet their burden of proof. While the modification is not fatal, it is an additional issue the court must consider in the "similarly situated" analysis of whether plaintiffs provided substantial evidence of a corporate-wide community work policy.

Many sample plaintiffs, including individuals from Louisiana, Washington and Texas, testified that they were required to perform community work. Those plaintiffs maintained that they did not record the amount of time they spent performing community work because they believed Alderwoods would not compensate them for that work. Some sample plaintiffs proffered that Alderwoods' failure to compensate them for required community service was a corporate-wide policy.

Other sample plaintiffs testified, however, that Alderwoods did not have a policy that required them to perform after-hours community work. Importantly, Prise and Rady testified that they sometimes received compensation for performing after-hours community work. Rady explained that at some point in time there was a policy change regarding community work compensation practices. The timeframe, however, was not disclosed. Various management personnel including Collins confirmed that Alderwoods did not require community work; rather, community work was encouraged, and employees did not adversely suffer if they declined to perform community activities. One location manager explained that not all employees under his supervision joined a civic organization or performed community work.

Plaintiffs rely upon job title descriptions, the CLP, and Collins' deposition testimony to support their community work allegations. While those pieces of evidence indicate Alderwoods *encouraged* support of civic organizations and employee involvement in community work, they do not support plaintiffs' central thesis – that Alderwoods *required uncompensated* after-hours community work. Plaintiffs assert the Toye email demonstrates a corporate-wide policy to recognize community work in a nonmonetary way. The Toye email, however, lacks weight in this regard in light of: (1) Toye not speaking in the email as a corporate-wide representative, but as a market general manager responsible for a limited territory; and (2) Collins submitted a declaration and was deposed about the Toye email and unequivocally stated that the email was a misstatement of company policy. This factor supports a finding that plaintiffs are not similarly situated and supports the decertification of a nationwide collective community work class.

### 2. Second factor - various defenses available

Plaintiffs argue that the majority of Alderwoods' defenses relate to damages, i.e., the amount of overtime compensation due to each plaintiff. Plaintiffs contend individual defenses related to damages should not preclude certification; rather, the trial may be bifurcated into liability and damages phases.[19]

Plaintiffs' argument is unpersuasive because they fail to address the preliminary issue of liability, i.e., whether a violation occurred. Only after liability is found can the court determine the *amount owed* to each opt-in plaintiff in a damages phase of a trial. Alderwoods' arguments concerning damages do not focus on how much money is owed to each opt-in plaintiff; instead, Alderwoods raises concerns about liability based on the testimony of sample plaintiffs. For example, Alderwoods contends that an individualized defense may be asserted regarding whether the community work for each plaintiff was voluntarily performed or required at the direction of the company. (See Def.'s Mot. at 17.) Many sample plaintiffs testified that community work was a job requirement, but just as many plaintiffs testified that it was not.

In circumstances where plaintiffs did not record their community work, Alderwoods may assert it did not have knowledge the work was performed. (Id. at 18.) For example, several sample plaintiffs explained that they did not record community work performed because they were resigned to the fact that Alderwoods would not compensate them for that time. In instances where employees performed community work and received compensation (e.g., Prise and Rady), Alderwoods may not be liable to those plaintiffs and could assert a defense on those grounds.

This case is similar to the circumstances in Lugo, where the court granted the defendant's motion to decertify a FLSA collective action implicating violations of the ADEA. There, the liability of the defendant under the FLSA depended upon "whether [it] failed to pay a particular

---

[19] There is authority supporting bifurcating the liability and damages phases for trials of complex class actions, and courts have used formula-based strategies and expert testimony to determine damages computations in those instances. See MANUAL FOR COMPLEX LITIGATION § 21.5 (4th ed. 2004).

plaintiff for compensable time . . . ." <u>Lugo</u>, 737 F. Supp. 2d at 303. The court determined that "any such undercompensation was not suffered on a collective basis – but rather that defendant's policies and practices impacted individual plaintiffs in individual ways." <u>Id.</u>

Here, it would be necessary to conduct an individualized inquiry for each plaintiff to determine whether Alderwoods required them to perform community service after hours and whether they received compensation for that work. In light of the differences in the testimony adduced, there are fundamental, individualized liability issues that cannot be reserved for a damages trial. While the court does not address the merits of the claims at the certification stage, whether plaintiffs are similarly situated contemplates an inquiry into the disparate allegations of the sample plaintiffs. Here, the varied factual situations of sample plaintiffs evident from their deposition testimony show that there will be individualized defenses to liability that will be presented at trial. This factor supports a finding that plaintiffs are not similarly situated and supports the decertification of a nationwide community work class.

### 3. Third factor – fairness and procedural considerations

Plaintiffs propose that the trial be bifurcated into liability and damages phases and suggest the court has various tools at its disposal (e.g., representative testimony, special master proceedings, damages formulae, etc.) to address Alderwoods' concerns about fairness and manageability.[20] Plaintiffs argue that they would suffer prejudice if the collective class is

---

[20] Plaintiffs insist that representative testimony at trial would remedy concerns about holding hundreds of mini-trials to determine liability. Unfortunately, plaintiffs did not offer substantial evidence to warrant a finding that the representatives would be similar to nontestifying plaintiffs. Drawing liability conclusions about a large group based upon a small portion of statements can be problematic, especially when testimony among the representatives themselves is disparate. <u>See generally</u> <u>Reich v. So. Md. Hosp., Inc.</u>, 43 F.3d 949, 951 (4th Cir. 1995); <u>Johnson v. Big Lots Stores, Inc.</u>, Nos. 04-3201, 05-6627, 2008 WL 1930681, at *16 (E.D. La. Apr. 29, 2008).

decertified because they are at a financial disadvantage and would be unable to bear the costs of individually pursuing their claims.  (See Pls.' Resp. at 25.)[21]

Based upon the various defenses to liability asserted by Alderwoods that are not common to all plaintiffs and the disparate factual and employment settings of individual plaintiffs, the court would be forced to hold hundreds of mini-trials on liability, which would create the potential for unfairness to plaintiffs and defendant.  The court in Lugo adeptly addressed this fairness issue:

> If the present case were tried collectively and a verdict reached for defendant, this result would be unfair to those plaintiffs who may have been denied pay owed to them for [the activities at issue]; similarly, if a verdict were reached for plaintiffs, this would be unfair to defendant, who would be deemed liable as to the entire collective class when it may not have undercompensated all individual members of that class.

Lugo, 737 F. Supp. 2d at 303.  That specter of unfairness is likewise present in this case and supports a finding that plaintiffs are not similarly situated and supports the decertification of the nationwide community work class.

## B. On-call work

### 1. First factor – factual and employment setting of individual plaintiffs

Some sample plaintiffs, including a California funeral director and embalmer, testified that they were not permitted to record on-call work and did not receive compensation for that work.  Several sample plaintiffs stated that, prior to the installation of time clocks, they were paid a flat fee or rate for on-call work, such as removals.  Plaintiffs' testimony differed, however, regarding the particular amounts of compensation (e.g., Burgess noted Alderwoods credited

---

[21] The court does not have before it the issue whether there could be a separate collective action suit brought for claims involving the same supervisors or regional managers.

employees a flat rate of three hours per removal performed on-call; Diggs stated Alderwoods paid a flat rate of $35 per removal; Garmback indicated a flat rate of $65 per removal). Some sample plaintiffs maintained they were not permitted to record time worked on call.

Other sample plaintiffs, including an Oklahoma funeral director and embalmer and an Indiana funeral director and location manager, testified that they were permitted to record on-call work and received compensation for the reported time. Prise indicated that she was compensated for on-call removals, but not for time spent on the telephone or traveling to the funeral home. Rady explained that, on one occasion, she performed on-call work, requested compensation for that work, and was paid for the on-call services rendered.

Collins rejected plaintiffs' contention that Alderwoods' piecework or flat rate on-call compensation practices were disseminated on a corporate-wide basis. Collins explained that piecework was a funeral home legacy and Alderwoods eliminated instances of piecework pay on a location-by-location basis. Collins emphasized that piecework pay was not a corporate-sanctioned policy.

Here, substantial evidence of a corporate-wide Alderwoods' decision, policy or plan that required plaintiffs to perform uncompensated on-call work was not presented. To the contrary, several sample plaintiffs, including the named plaintiffs from Pennsylvania, indicated they, at least on occasion, were paid for on-call work. The disparate factual and employment settings, particularly in light of the named plaintiffs' testimony, and the lack of substantial evidence of a corporate-wide decision, policy or plan with respect to the on-call work policy, supports a finding that plaintiffs are not similarly situated and supports the decertification of the nationwide on-call work class.

### *2. Second factor – various defenses available*

Several of the individualized defenses raised with respect to the community work policy issues are applicable to the on-call work policy, such as whether the employee actually performed on-call work, whether Alderwoods knew that on-call work was performed and whether the particular employee was compensated for that work. The same considerations discussed in <u>Lugo</u> regarding individualized defenses to liability exist for on-call work – Alderwoods' compensation practices impacted plaintiffs in individual ways that are not amenable to class-wide defenses. This factor supports a finding that plaintiffs are not similarly situated with respect to this class.

### *3. Third factor – fairness and procedural considerations*

Because plaintiffs' testimony varied widely regarding their on-call work policy experiences, it would be unfair and prejudicial to impose the procedural requirements of a collective action trial on the parties. The absence of class consistency and substantial evidence of a corporate-wide decision, policy or plan compels decertification of the on-call work collective class.

.

### *C. Overtime preapproval*

### *1. First factor – factual and employment setting of individual plaintiffs*

Various plaintiffs, including funeral directors and embalmers from Washington, Texas, Pennsylvania and Michigan, testified that they worked overtime without obtaining preapproval and did not receive any compensation for their overtime. One funeral director and embalmer from Texas testified that he obtained preapproval, but did not receive compensation, for the

work.  Several plaintiffs asserted that management altered their time cards to remove overtime that was not preapproved.  Other individuals indicated that it was Alderwoods' policy not to compensate overtime work unless it was preapproved.

Despite that testimony, many plaintiffs, including an Alaska funeral director and embalmer, testified that overtime preapproval was not required to receive compensation for that work.  Sample plaintiffs testified that they were not required to obtain preapproval to work overtime, received compensation for overtime without preapproval, or received partial payment for working overtime without preapproval.  Two managers confirmed that Alderwoods did not maintain a corporate-wide policy that required uncompensated overtime if the employee failed to obtain preapproval.

With respect to the emails and other documents indicating Alderwoods maintained the alleged preapproval policy, a careful review of those documents shows that for the most part they reflect the comments of managers responding to isolated incidents at particular funeral homes.  While the statements in the documents are supportive of the claims of the individual plaintiffs supervised by those managers, they do not rise to the level of *substantial* evidence supporting a corporate-wide decision, policy or plan.  Indeed, they are refuted by certain sample plaintiffs' testimony which indicated preapproval was not required to work overtime, or that certain plaintiffs received compensation for working overtime regardless whether it was preapproved.  In light of the various disparities among sample plaintiffs regarding the overtime preapproval policy and the absence of substantial evidence to implicate a single corporate-wide overtime preapproval decision, policy or plan, decertification of this class is proper.

### 2. Second factor – various defenses available

Several of the individualized defenses to liability previously discussed are applicable to the overtime preapproval policy, such as whether the employee was required to obtain preapproval before performing overtime work, whether Alderwoods knew that overtime work was performed without preapproval and whether the employee was compensated for that work. The same considerations discussed in Lugo regarding individualized defenses to liability exist for the preapproval of overtime work – Alderwoods' compensation practices are not amenable to class-wide defenses because they impacted plaintiffs in ways that were discreet to different plaintiffs. This factor supports a finding that plaintiffs are not similarly situated.

### 3. Third factor – fairness and procedural considerations

Because plaintiffs' testimony varied widely regarding their experiences with the overtime preapproval policy, it would be unfair and prejudicial to impose the procedural requirements of a collective action trial on the parties. The absence of a similarly-situated finding and insufficient evidence to support a finding of a corporate-wide decision, policy or plan compels decertification of the overtime preapproval class.

### D. Training for insurance licenses

### 1. First factor – factual and employment setting of individual plaintiffs

Testimony among sample plaintiffs was inconsistent with respect to compensation practices for insurance licensure training. Several plaintiffs, including an Arizona assistant funeral director, a Pennsylvania location manager and a Pennsylvania funeral director and embalmer, testified that Alderwoods required funeral directors to obtain an insurance license to

sell "pre-need" insurance. Certain plaintiffs also testified that, when required to obtain their license, Alderwoods did not compensate them for fees and expenses associated with the license.

Conversely, many plaintiffs in different employment positions and geographic locations, including an Indiana funeral director and location manager, a Georgia apprentice funeral director and embalmer and a Michigan funeral director and embalmer, maintained that Alderwoods did not require employees to sell pre-needs insurance. One manager affirmed that obtaining an insurance license was not an Alderwoods' requirement. At least one plaintiff testified that he received compensation for time dedicated to continuing education courses for his insurance license. Notably, plaintiffs testified that insurance licensure requirements varied depending upon particular state laws (e.g., New York law did not permit funeral directors to sell pre-needs insurance).

The inconsistent and individualized experiences concerning insurance training compensation indicates that plaintiffs are not similarly situated. Based upon the evidence presented by plaintiffs to meet their burden of proof, the court cannot discern substantial evidence of one coherent insurance training policy, plan or decision implemented on a corporate-wide scale. For those reasons, decertification of the insurance training class is warranted.


### 2. Second factor – various defenses available

Several of the individualized defenses to liability previously discussed are applicable to the insurance training class, such as whether the employee was required to sell insurance and obtain an insurance license, whether the relevant law in a particular state barred an employee from selling insurance, and whether the employee was compensated for training associated with obtaining or maintaining their insurance license. The same considerations, discussed in Lugo,

regarding individualized defenses to liability exist for insurance training – Alderwoods' compensation practices impacted plaintiffs in individual ways that are not amenable to class-wide defenses. This factor supports a finding that plaintiffs are not similarly situated with respect to the insurance training policy.

### 3. Third factor – fairness and procedural considerations

Because plaintiffs' testimony varied widely regarding their experiences with the insurance training policy, it would be unfair and prejudicial to impose the procedural requirements of a collective action trial on the parties. The absence of class consistency and a discernable single corporate-wide decision, policy or plan compels decertification of the insurance training class.

### E. Employee meal breaks

### 1. First factor – factual and employment setting of individual plaintiffs

Several sample plaintiffs, including a Kansas location administrator, asserted they were consistently required to work uncompensated through their entire meal break or a portion of their meal break, even when their time records reflected they worked through their meal break. A number of plaintiffs, including a Washington funeral director and embalmer and a Georgia apprentice funeral director and embalmer testified, however, that they were compensated for work performed during their meal breaks. Plaintiffs indicated that when they made notations on their time cards such as "no lunch," they received compensation for their meal break.

Rady's testimony was particularly contradictory and is emblematic of sample plaintiffs' inconsistent testimony as a whole. Rady initially received paid meal breaks, but at some point

she no longer received paid meal breaks.  When Rady wrote "no lunch" on her timesheet her supervisor initialed the entry, indicating it was "okay" she did not take lunch that day.  Whether Rady received compensation in those instances is unclear.

A common thread running through plaintiffs' testimony concerning the meal break policy was that compensation practices varied not only among plaintiffs, but for each sample plaintiff viewed in isolation.  For example, several plaintiffs explained that sometimes they would receive compensation for working through a meal break, while other times they did not.  In some instances they received compensation if they wrote "no lunch," while other times they would receive full or partial compensation if they pursued the issue with their supervisor.

The factual and employment settings of sample plaintiffs with respect to the meal break policy lack consistency.  Plaintiffs also failed to articulate cogently a single corporate-wide decision, policy or plan about nonpayment for meal breaks or that such a plan similarly affected plaintiffs.  Based upon the first factor, decertification of the meal break class is appropriate.

### 2. Second factor – various defenses available

Several of the individualized defenses to liability previously discussed are applicable to the meal break class, such as whether the employee was required to perform work for Alderwoods during a meal break,[22] whether the particular meal break was a bona fide meal break, including the time, frequency and duration of the interruptions, and whether the employee received compensation for a meal break.  The same considerations, discussed in <u>Lugo</u>, regarding

---

[22] The applicable federal regulation and relevant caselaw indicate a bona fide meal break does not require the employer to provide compensation to the employee for the period of that break.  <u>See, e.g.</u>, 29 C.F.R. § 785.19 ("Bona fide meal periods are not worktime."); <u>Oakes v. Pennsylvania</u>, 871 F. Supp. 797, 799 (M.D. Pa. 1995) (with respect to meal periods, "the test for whether compensation is required is whether the employee's time is spent predominantly for the employer's benefit or the employee's benefit"); <u>McGrath v. City of Phila.</u>, 864 F. Supp. 466, 480-81 (E.D. Pa. 1994) ("predominant benefit" test determines compensability).

individualized defenses to liability exist for meal breaks – Alderwoods' compensation practices impacted plaintiffs in individual ways that are not amenable to class-wide defenses and this factor supports decertification of this class.

### 3. Third factor – fairness and procedural considerations

Because plaintiffs' testimony varied widely regarding their experiences with the meal break policy, it would be unfair and prejudicial to impose upon the parties the procedural requirements of a collective action trial. Prevalent class inconsistencies and the failure to demonstrate substantial evidence of a single corporate-wide decision, policy or plan compels decertification of the meal break class.

### VI. Conclusion

The five classes must be decertified. Each of the factors reviewed for the classes supports the decertification. Plaintiffs failed to satisfy their burden because they did not set forth substantial evidence that the opt-in plaintiffs are similarly situated to the named plaintiffs. Testimony from sample plaintiffs and management in each class were inconsistent regarding Alderwoods' compensation practices and failed to provide sufficient support to implicate the existence of a single decision, policy or plan implemented on a corporate-wide basis that similarly affected plaintiffs. For the reasons discussed above, Alderwoods' motion to decertify the conditionally certified collective action will be granted. An appropriate order shall follow.

By the court:

Dated: September 9, 2011

/s/ JOY FLOWERS CONTI
Judge Joy Flowers Conti
United States District Judge